# VIRGINIA LYNNETTE FABRITZ v. STATE OF MARYLAND

[No. 500, September Term, 1974.]

*Decided February 21, 1975.*

The cause was argued before MORTON, LOWE and MELVIN, JJ.

*Richard J. Clark, Assigned Public Defender,* for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Warren F. Sengstack, State's Attorney for Calvert County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Virginia Lynnette Fabritz, a twenty year old mother, was tried by a jury in the Circuit Court for Calvert County for child abuse and assault and battery upon her now deceased daughter, Windy Lynn Fabritz.[1] The State conceded, and the judge acknowledged in his instructions to the jury, that:

> "The State has not attempted to prove in this case that the Defendant struck the blows or applied the blunt trauma as the doctor referred to it which caused the injuries, the initial injuries to this child and set in train the physical changes which ultimately resulted in its death."

To the contrary, the evidence clearly showed that the child was in the custody of another at the time the injury was inflicted [1A] and a polygraph examination verified not only that she had not inflicted the injury, but that she did not know who did inflict it, nor suspect that it was going to happen.[2] Indeed her pastor, the associate pastor of St. Paul's

---

1. Although the names of appellant and her daughter are spelled various ways throughout the record, the spelling used here is that of the indictment.

1A. Thomas Crockett — a co-defendant in whose custody Windy was during the two day period culminating in her injuries — was subsequently tried but acquitted for lack of evidence.

2. Defendant's exhibit No. 1, admitted without objection, contained the results of a Polygraph Examination conducted by the Maryland State Police. Of the six possible results, *viz,* 1) truthfulness, 2) deception, 3) inconclusive reaction, 4) statement obtained, 5) referred to be examined or 6) re-examination requested, all answers to relevant questions "indicated truthfulness." The report commences by stating the purpose of the examination:

> "Mrs. Fabritz is brought to polygraph to ascertain if she is any way involved in the death of her 3-year old daughter."

After responding that she intended to answer truthfully each question, she denied hitting or causing the child's death by hitting. The examiner stated:

United Church of Christ, indicated that "She [M's. Fabritz] had a good relationship with Windy, Windy loved her and she loved Windy. It was obvious both vocally and by non-verbal communication"; and the Social Services Representative with the Department of Human Resources, who had known and worked with M's. Fabritz and Windy for a year described the mother-daughter relationship as a very good one.

> "She always seemed concerned about Windy. I never even saw her angry at Windy. They seemed to be in good relation, they seemed to love each other very much and she always seemed concerned about the child's welfare. And always knew pretty much what the child was doing and exactly where the child was."

The trial judge entered a judgment of acquittal as to the assault and battery, having found "no evidence in this case of any hitting or assaulting of the child by this Defendant."

---

"It is the opinion of the examiner that the above questions were answered truthfully."

As the examination progressed she was also asked the following additional relevant questions:

"34. Regarding the death of Wendy at the very time that Wendy was struck in the stomach were you, yourself, present?
Answer: No

35. Regarding the death of Wendy did you, yourself, hit Wendy in the stomach? Answer: No

32. Regarding the death of Wendy do you know for sure who struck Wendy in the stomach? Answer: No

31. Regarding the death of Wendy do you suspect anyone in particular of striking her in the stomach? Answer: No

41. Regarding the death of Wendy are you deliberately holding back any information about that? Answer: No

42. Regarding the death of Wendy, before she was actually struck did you already know it was going to happen? Answer: No

. . .

It is the opinion of the examiner that above tests were also answered truthfully."

The issue of admissibility of polygraph results is not before us and we venture no opinion thereon.

The child abuse question, however, was permitted to go to the jury. The judge said:

"With respect to the analysis of the evidence as it applies to the abuse statute, we think that the statute intends to make a criminal act any positive abuse or any actions by a custodian of a child which amount to cruel or inhumane treatment. . . . And the view the Court takes of the matter, a person who has the custody of an infant has a two-fold duty, that is to refrain from actively injuring the child himself which is an act which ought not to be done as well as an obligation which can not be avoided to take positive action to protect and care for the child. Those positive actions fall into several categories to provide it with necessary shelter and the necessary sustenance to sustain life as well as that medical attention which is available to protect it from the consequences of injuries no matter how received."

The judge concluded that to permit a child who is obviously seriously injured to expire from want of readily available attention, may in a given circumstance constitute "cruel and inhumane treatment," borrowing that phrase from the child abuse statute:

"It is unquestionably inhumane to permit someone who is unable to care for itself and provide for its own medical attention to expire for want of that medical attention and in this case, the testimony shows that, although it became progressively less and less, there was a chance for this child to survive at any point from the time the Defendant returned home until very close to the time it expired, had it been brought to the attention of the medical authorities. This was not done and we think the question of whether or not that, in the facts of this case, is a criminal offense turns essentially upon the finding of the fact by the jury."

As previously noted there was no evidence that M's. Fabritz inflicted Windy's injury. Thus the actions upon which the verdict was based occurred during the eight hour period when Windy was in her mother's presence. M's. Fabritz bathed Windy twice (once with alcohol), put her night clothes on, tried to feed her, took her temperature and finally tried to call a doctor. During that period, she had to have observed the child's badly bruised body, as did a neighbor who assisted her. In the eighth hour after arrival home Windy convulsed and was rushed to the hospital. She was pronounced dead on arrival, death having been caused by peritonitis resulting from a blow to the stomach. The State's "cruel and inhumane treatment" theory rested on appellant's failure to seek professional medical help until the child convulsed and death was imminent.

The jury found M's. Fabritz guilty of child abuse and the judge sentenced her to five years imprisonment. We do not find the evidence sufficient to sustain that conviction under the language of the statute as repeated in the indictment. See n. 4, *infra.*

The judge's opinion in denying the motion for judgment of acquittal and his instructions to the jury interpreted the child abuse statute, Md. Code, Art. 27, Sec. 35A, as applying to a person's failure to act to prevent aggravation of an injury. We cannot read that interpretation into the language of the Act.

At the time of the offense the pertinent language was that enacted by Chapter 835 of the Laws of Maryland, 1973. Although it was again amended the following year the change is not here pertinent. The relevant language of Chapter 835 read:

> "*Penalty. — Any parent,* adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision *of a minor child* under the age of eighteen years *who causes* abuse to such minor child shall be guilty of: a felony and upon conviction shall be sentenced to

> not more than fifteen years in the penitentiary . . . ."
>
> " '*Abuse*' shall mean *any physical injury or injuries* sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts by any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for supervision of a minor child." [Emphasis added]

Basic to proof of the corpus delicti is a showing that the accused is among the named persons to whom the Act applies (here appellant was the parent) and secondly that such person *caused* the injury sustained by the child. This meaning is readily apparent by substituting the definition of "abuse" for the word "abuse" as it appears in the penalty section so that it reads in relevant part as follows:

> "Penalty. — Any parent, . . . of a minor child . . . who causes . . . [any physical injury or injuries] to such minor child shall be guilty of: a felony . . . ."

We read nothing in this statute, nor its history, which might suggest the Legislature's intent to encompass those parents, etc. who withhold from their children the necessities of life which the Court of Appeals has interpreted as including medical care, *Craig v. State*, 220 Md. 590, 596.

Prior to 1973 the statute did not use nor define the term "abuse." It penalized any person within the enumerated categories:

> " . . . who maliciously beats, strikes or otherwise mistreats such minor child to such degree as to require medical treatment . . . ."

Although the phraseology was somewhat altered by the revised version contained in House Bill 1056, adopted in 1973, as Chapter 835, the express purpose of the revision was to encourage the reporting of instances of abuse and only incidentally to rearrange and revise the language thereof. This view is substantiated by the title which is

constitutionally required to describe the content of the bill,[3] Md. Constitution, Art. III, § 29, and the purposes expressed in the newly adopted preamble.[4]

We conclude that to be guilty under the statute, the accused must be shown to have caused the injury, not simply aggravated it by failure to seek assistance. Our review of the record compels us to remark upon our concern that the State has been unable to apprehend and punish the execrable wretch who committed this unbelievably vicious act. The alternative of turning to the tangentially culpable mother, whose judgment was so unwise that her child's death may well have been the result, seems somehow unfulfilling. The sentence for her hesitancy during that eight hour period will not end after five years as would the sentence formerly imposed.

> *Judgment reversed.*
> *Costs to be paid by Calvert County.*
> *Mandate to issue forthwith.*

---

3. The descriptive portion of the title reads:

" . . . to provide certain definitions in the child abuse law and to mandate the reporting of suspected child abuse to certain agencies, and providing for cooperative efforts by certain agencies in cases of child abuse, and extending immunity to persons who report child abuse cases in good faith, and generally clarifying and extending the law relating to child abuse."

4. The preamble reads:

"Purpose. — The General Assembly hereby declares as its Legislative intent and purpose the protection of children who have been the subject of abuse by mandating the reporting of suspected abuse. By extending immunity to those who report in good faith, by requiring prompt investigations of such reports and by causing immediate, cooperative efforts by the responsible agencies on behalf of such children."

The mandate to report, whether applicable here or not, was not the crime with which appellant was charged. The indictment charged that M's. Fabritz:

" . . . did unlawfully abuse, Windy Lynn Fabritz, a minor child under the age of eighteen years, by inflicting physical injuries sustained as a result of cruel and inhumane treatment, or as a result of malicious act or acts, . . . ."